Mr. Haar. Good morning, Judge. May it please the Court, my name is Robert Haar, and I'm appearing on behalf of the appellant, Thomas Kmak. This is an appeal from a dismissal of a complaint for failure to state a claim under Rule 12b-6, and as a consequence, your review is de novo. The facts in the complaint are taken as true, and the appellant's entitled to all reasonable inferences, and I think that those facts are important in terms of gauging the sufficiency of the complaint here. It's alleged that Thomas Kmak was a high-ranking executive with American Century, that he was head of their retirement... Is it true that it was not alleged in the complaint that his testimony was not helpful? Judge, it's a reasonable inference. What it's alleged in the complaint is that he was retaliated against for his testimony was not favorable. He was head of their retirement plan services division, and over a decade built that division from nothing to over 1,100 employees and over $100 billion in assets under management. For his efforts, he was rewarded stock options, and he exercised those options in two tranches in 2003 and 2005, ultimately purchasing 238,000 shares with a loan of $5 million arranged by American Century through a local bank. And in conjunction with that purchase, he signed the stock restriction agreement, which provided, among other things, that if he left American Century, that American Century would have the right to call his shares for repurchase at any time. It's alleged in the complaint that given the financial exposure of this transaction, Mr. Kamak went to the CEO and was assured that his stock would only be called for repurchase if he joined a competitor. He was with American Century until 2003, when his division was purchased by J.P. Morgan, and he was with J.P. Morgan until 2007. And then in 2007, he left J.P. Morgan to go into business, start his own business, which has nothing to do and does not compete in any way with American Century. And so he received his dividends every year, owned this stock throughout this period of time. The arrangement was that dividends would be used to pay interest on the loan. Now, where is that arrangement? That was arranged when he originally did the financing, yes. The dividends would be paid to the bank to pay down the interest on the loan. In 2011, long after he left American Century and years after he left J.P. Morgan, a dispute arose between J.P. Morgan and American Century. And Mr. Kamak was called as a witness by J.P. Morgan in the context of that arbitration. And as I've stated, the reasonable inference from the second amended complaint is that his testimony was not favorable to American Century. Soon after the hearing, for the first time, and now he's owned some of this stock for almost eight years, he gets a letter from the bank to call his shares for repurchase at any time. He obviously is concerned the balance of the loan is still close to $5 million, receives assurances from a member of the board that there's no plan to call his shares. And then on December 5th... What was the price at that moment in relation to what he paid? It was less than he paid. And in fact, as we'll find out, all of his shares were repurchased at a price less than he paid. On December 5th, 2011, just like every other year, the bank is notified that he's going to receive the yearly dividend, that he's one of the shareholders of record. He's going to get 80 cents a share, $190,000. This is December 5th. Now, the way the program worked is if American Century was going to call the shares, they had to call the share and use the valuation from the prior month. They had to call the shares by the 10th day of the following month, which would have been December 10th. If they were going to deny him the annual dividend, they would have to call his share before December 10th. It's alleged in the complaint that between December 6th and 9th, the award that American Century received from that arbitration was in excess of $370 million became final. It was confirmed by the court. And then on December 9th, one day before they would have lost the opportunity to do so, American Century calls Tom Kamak's shares, the only shareholder. Can we get to the issues? Well, Judge, the issues are this. As we state, the issue here is in light of the manner in which these shares were recalled. Mr. Kamak filed this complaint alleging that there was a breach of the implied covenant of good faith and fair dealing under Missouri law. Okay. And my question is, in what Missouri appellate decision has ever used the reasonable expectation doctrine to trump an unambiguous contract? There have been a number... Before we get to the covenant, you've got two issues in your brief. And, Judge, this court has had numerous opportunities to address the implied covenant of good faith and fair dealing under Missouri law. We're not the controlling... You know, this is a diversity case. I asked you what Missouri appellate decision has used the reasonable expectation doctrine to trump an unambiguous contract. Missouri Consolidated Health Care Plan. Pardon? Missouri Consolidated Health Care Plan, which this court cited in BJC Health Systems, which states, the mistake here that was made by the lower court, is it accepted a proposition that the Missouri courts have always rejected. And that is that a unilateral discretion under a contract is a shield against the implied covenant of good faith and fair dealing. What this court has said in cases like BJC Health Systems is that if a party is given unilateral discretion like American Century was here, the question under the covenant of good faith and fair dealing is whether or not that discretion was exercised in bad faith. And that's the standard that the Missouri courts have applied in, as I said, Missouri Consolidated Health Care. Okay. Didn't you break this up into a contract claim and a covenant claim? No, Your Honor. It's an implied covenant claim alone. Well, I know it, but I'm looking at your brief. I'm trying to, I'm trying to, the issues presented. Statement of the issues. One, implied covenant, reasonable expectation. And two is, is retaliation. So And they're related, Your Honor. Well, well, of course, but I didn't tell you to break them up in two. I assume you want me to address them in two. And I, I thought reasonable expectation was not a very powerful doctrine in Missouri contract law. Well, Your Honor, in fact, there's two parts to that test. The test is whether or not the exercise of discretion violated the spirit of the transaction or the reasonable expectation or, or, or denied the other party an expected benefit of the contract. We would submit that under both prongs of that test, there's a violation of the covenant here because clearly the purpose of the award of the stock options was to reward behavior. Retaliating against someone for their testimony in a arbitration proceeding is punishment. It's the antithesis of a reward. So it's clearly, it's inconsistent with the spirit of the transaction. My second, my second question is, is what if the agreement had said, if you testify we'll exercise the call? I think it would violate the public policy of Missouri, which is read into every contract. But it didn't say that. In a closely held company where, where stock holdings by former employees are, are of, of concern, natural concern. You can't write, you can't write, you can't write that in. I think it would raise an issue if in fact, again, it was an attempt to prevent people from testifying truthfully. I think that's beyond the pale. Well, it's not, it's not the situation here, Judge. I mean, what you, you wouldn't have a public, well, if you can't, if you could write it in explicitly, then why isn't it implicitly in the any, doesn't any time include that? No, it doesn't, Your Honor. Because again, the question has to be, is the exercise of discretion in bad faith? And I would submit to you that if you're retaliating against somebody, that's bad faith. And if that retaliation violates the public policy of the state, the bad faith argument is even stronger. And as we pointed out here, there is a public policy in Missouri that is against retaliation against individuals based on their testimony in a judicial or quasi-judicial proceeding. And that's, we cited to the court the jury opinion where that is set out. And if you look at the Missouri cases, like Missouri Consolidated, it specifically discusses that Missouri relies on Section 205 of the Restatement Second of Contracts with respect to the covenant of good faith and fair dealing. And in Missouri Consolidated, which this Court has cited on a number of occasions when it's implied covenant of good faith and fair dealing, it states, good faith performance or enforcement of a contract excludes a variety of types of conduct characterized involving bad faith because they violate community standards of decency, fairness, and reasonableness. Now, does that include public policy? Yes, it would, Your Honor. In fact, public policy would be the clearest example of that because obviously that's stronger than decency, fairness, and community standards. Does the restatement talk about public policy? Judge, I think that I don't know if in that particular comment it uses the phrase public policy, but I would submit to you community standards subsumes public policy. Public policy is a stronger, I think, touchstone than community standards of decency, fairness, and reasonableness. Is there any Missouri case that talks about public policy that's similar to the Lawrence case? There are cases, for example, the Bishop case, which they cite, talks about the fact there they found there was not bad faith, and part of their reasoning is there was no violation of public policy. So implicit in that was the notion that a violation of public policy would constitute bad faith. And I would submit if you read the brief of American Century, pages 23, 24, 28, they, in fact, I don't think deny that the calling of Mr. Kamak's shares under the circumstances here was retaliation. They talk about him being CEO of a wrongdoer company. And so, again, I think where the district court erred is the district court essentially concluded it doesn't matter if American Century did this in bad faith. It doesn't matter if they violated a public policy. American Century had the discretion, and that's the end of the story. And this court in Stone Motor, and, again, BJC Healthcare has consistently made the point that's not the end of the story. The question is whether or not the discretion was exercised in bad faith. And, again, if you retaliate against someone, and particularly under circumstances that violate the public policy of the forum, I think there is no way to escape the conclusion that the exercise of discretion was in bad faith. And, certainly, under those circumstances, you have stated a claim that would allow you to get past the pleading stage of this proceeding. And for that reason, we ask that the court reverse and remand. Thank you. Mr. Hendricks? Thank you, Your Honor. Randy Hendricks for American Century. I have four points I'd like to present to Your Honors today. One, I want to talk about the unqualified contract right. That's essential, we think, to define the bargain that was made. And in defining the bargain that was made, then we get into what would be the expected benefits of the contract. Well, it's clear on its face. I mean, get to what he just argued. That a pleading that says the exercise of unilateral discretion in bad faith gets to a jury on the breach of the covenant. Well, first of all, it's not a discretionary phrase. The contract itself talks about a right. It mentions it four times in paragraph 2H. It doesn't matter, doing it, electing to do it when it's permitted. Yeah, it was our time. Get to the case law. The case, well, in terms of distinguishing those discretionary cases, Your Honor, and let me start with the BJ Health Systems case. Discretion there was in the context of somebody, i.e., the reinsurer defendant, having discretion to perform a very complex calculation. It was actually an accurate. What case is this? This was the Eighth Circuit case of BJ Health Systems, Your Honor. It's against a reinsurer cited by and relied upon. I don't think it was talked about this morning. It's cited by the plaintiff. These discretionary cases deal with, in this instance, it was an actual incurred loss racial calculation, and that the abuse of discretion was in the amount of errors they made in their favor in order to deny an expected benefit of the contract. And one of the expected benefits of the contract was it would be for a three-year term unless there was an incurred loss ratio above a certain amount. Well, then the court did talk about a discretion. That's in contrast here where we have a defined contract right, which is simple and unqualified. If we have a stock option plan, as you referred to. Okay, that's okay. But get to the Missouri cases, you know. Well, there is no Missouri case. Well, you just talked about Missouri consolidated health care plan. And that's the same kind of situation. That's the guiding light from the western, the first of our current appeals. Well, first of all, it finds no violation of the good faith covenant in that case. So it's hard for them to rely upon a case which doesn't hold that there was a good faith in that situation. But beyond that, and in the language that was used, what the court was describing is very similar to the BJA health system case. And there, there was an issue whether there could be a premium increase. And to have that premium increase, there had to be an audit. And that audit involves a commitment that that could be done at the full discretion of the auditing party. Again, a complex situation which there are very many discretionary elements and acts and activities in the calculation of whether there should be a premium increase. In that situation, they could only increase the premium above the cap of the CPI based on a certain calculation. And the finding of the court was that the evidence did not show there was a, it evaded the spirit of the contract. But what, really what you get down to, Judge Loken, we think is, is there a denial of the expected benefit of the contract? And the benefit of the contract here. I don't think you want a jury trial on that. Well, we'd be happy to have a jury trial on that because look at the contract. We can take care of that. But look at the contract. We would win and have to win before we got to that point, would we not? Because is there any expected benefit of the contract that Mr. Kamak had? If you look at the language of the. I'm sure he didn't expect to get called just before he would have cashed in. Well, what he did was. I mean, forget the 80 cents. Did he earn another two and a quarter? He lost $3 a share dividend, right? Look at the purpose of the stock option. Isn't that right? That's alleged in the complaint. The special dividend as well as the regular dividend. Yeah. So, Mr. Kamak. The special dividend that resulted from the arbitration award which prevailed over his supposedly unfavorable testimony. Well, what the allegation was. If I got it wrong, I mean, that's what I'm getting out of. That's what I get out of the briefs. What the allegation is is he gave truthful testimony and American Century won $374 million. And what I would. And he would have gotten a big special dividend. He would have had the. As well as a regular dividend. Yes, he would have. And he didn't get those because within a day or two of the award coming in. But the key point. It was called. It was called. Yes, Your Honor. And the key point, we believe, is under the implied covenant, what you have to look at is the language of the contract and the expected benefit of the contract to Mr. Kamak back in 2003 and 2005. At that point in time, he signed an agreement. And I would refer the court to read and ask you to read. Give me the Missouri case for that proposition. That's the point of inquiry on when reasonable expectation is. We cite the Shell case, Your Honor. But it's clear law in the implied covenant that the only measure, the only measure of the reasonable expectations is at the time of signing the deal. We also cite the Bishop case for that. And that's a clear concept. It's a central principle in the implied covenant. So you have to look at what was in the contract and the bargain. If you look at 2HI or 2H subpart 3, the contract says we have the right to call it at any time following the purchaser's termination of the company's employment. Clearly that was the situation here. How do you think this public policy argument fits into this? If the company decides to call it based on some ground that is contrary to Missouri public policy, he says retaliating against testimony is such a policy, I suppose, calling it based on race or religion or something like that would be alleged to violate a policy of Missouri. Is that part of the implied covenant of good faith and fair dealing, that you can't call it on those grounds? Yes, in this context, in a stock option plan, there is no Missouri case, whatever the public policy is, that says that you can't, that wants to look behind your contractual rights and gets to the motive. And that's what he's talking about. He alleges a bad motive. And, by the way, and I think that's significant, he doesn't allege in his complaint a violation of a public policy. But beyond that, any case, if you go outside of Missouri, any case that talks about using a public policy as a reason for an implied covenant has as its nexus that the use of that public policy interfered with an expected benefit of the contract. And what I think is clear from this contract is that American Century had the right to call it at any time. I've already said that. But if you go to the paragraph sub part three, it defines what the rights were in this stock that he held, this restrictive stock, and those rights are upon delivery of a notice of calling those shares, expire except for the right to get an independent appraisal value for each share. So contrary to what was described by my opposing counsel, what the contract shows is that when the call is made, this stock reverted immediately to only having a right to the appraised value of the shares, which there's no dispute was given to him. And so there was a fair transaction based upon the bargain that was struck in 2003 and 2005, and the contracts were signed. So just so I understand. So just where you get down to the rub here is that he had no expected benefit to any dividend. That's clear from reading the contract. So you're saying even if the motive violated a public policy, that's not enough because it didn't? Not for the implied covenant. Not for the implied covenant to work in this situation where you have an executive being granted stock options and we have a stock option plan where the essential purpose of that plan is to motivate employees, current employees, to act in the best interest of the company. It aligns the interest of the employees. I thought he was already working for J.P. Morgan when he got the stock. Well, he was granted the options. So a central part of the options and giving him that right was to motivate him to act because he had an option pricing for the best interest of the company. And that was given, according to the agreements themselves, between 1998 and 2002. So the record's clear. It's like any other stock option plan. It's to align the executive with the interest of the company. So the bargain struck was he got to execute and exercise a stock option or not exercise a stock option. His election. And he got to exercise it at the stock option price. And as long as he stayed with the company, he held that stock. But the other side of the bargain was a right of American Century to call it at any time. So this contract then, I guess the way you're saying it, wouldn't it deter him from providing any testimony that would be unfavorable to American Century because that's the nature of the contract, that if he were to do so, he should understand that he could lose his options? Is that what you're saying? Well, what he should understand and did understand from reading the contract, it could be called at any time, whether he testified or not. But there's no allegation that this was used in intimidation. And this is not part of an intimidation case. I thought it was alleged retaliation, which would, I guess it's a question of before or after the fact. But it's alleged that it was a retaliatory call. There was an alleged bad motive in a conclusory fashion, which I want to address as my final point. The allegation in paragraphs 49 and 50 was that the stock was called in retaliation for his death. You think that there's an Iqbal problem with that? I do. And this is, let me explain, and we present that in our briefing. If you look at the six basic facts that are alleged, there is a plausibility issue that we don't think Mr. Kamak can overcome. What he alleges is in March of 2011, he testified at a hearing under subpoena and gave truthful testimony. Then he says he has a letter from American Century in May of 2011 that recites American Century's rights in the contract and informs him of those rights. Then he alleges that he heard that the chairman of the board, through Mr. Stowers, the chairman was stating that they would not call his stock, and the purpose of the letter was only to remind Kamak of the right to do so. Then on December 5, he alleges that there was a letter to the bank where he had his stock pledged listing that Mr. Kamak is receiving regular dividends. So every single fact alleged after December 5 for nine months implies and demands the reasonable inference, those facts do, and the only reasonable inference, that American Century hadn't made a decision to call the stock. So if they hadn't made a decision in those nine months to call the stock, where is the inference that it came from the hearing nine months earlier? There is none. What he does allege was that American Century received $374 million and thus he had the money to buy the stock. But it's hard to square, impossible to square, the idea that there was retaliation from these facts alleged when for nine months the clear indication of American Century was they're not going to call the stock. What about the confirmation of the award, is that alleged in the complaint? Because Mr. Carr said that the call came right after the confirmation of the award. The confirmation and payment of the award. Yeah, is that alleged in the complaint? I think it is. It's alleged to have occurred before, both the confirmation and the payment of the award, occurred before the stock was called on December 9. Right. And as we present and we cite in Missouri cases, doesn't that present beyond just the Iqbal and Trombley pleading problem? It is as simple as a post hoc ergo proctor heart problem. He's got an event that followed. What's a causation proximity argument? Yeah, exactly.  It's defective as a matter of logic. Why is it defective as a matter of logic? I thought the argument was American Century won the award on day one. They're unhappy with CAMAC because of that, and so they call the stock options within the next day or two. Excuse me. Maybe I'm missing. What's the logical flaw with that? The logical flaw is this. If they had a motive, their sole motive was to. You're saying they would have called nine months earlier? They would have called in April, May, or June. When he testified. When he testified. If that was really what. If he's trying to bring the inference, which always has a post hoc ergo proctor heart problem, if he's trying to bring the inference. Well, it was an annual deal, though, so they could have done it at any time between the testimony and December 9. But what was distinct about the timing of the call, as alleged, was that they received $374 million in cash, and they had the excess cash to pay, as Judge Lotham pointed out, to control the issuance of restricted stock in this privately held corporation. So we think it goes beyond a neck ball problem. It goes up to a basic logic problem. Your time's up. Okay. Thank you. Mr. Hart, for a rebuttal, two minutes. Judge, if you're going to retaliate against a witness in arbitration, you're not going to do it before the confirmation. And raise that type of issue, J.P. Morgan talking about retaliation against witnesses and whether that may have infected other witnesses on behalf of American Century. So the timing, I think, strongly supports the inference with respect to retaliation, nor is there any complexity test with respect to the implied covenant. I don't understand that. I mean, the confirmation of arbitration awards is on the arbitration record. So you probably couldn't, I mean, J.P. Morgan probably couldn't even get into the confirmation judicial review record that this stock had been called. I think that's unclear, Judge. And, again, the timing of the argument is not intuitively sound. But, again, I think when you look at the sequence of events and, again, we're talking about the pleading stage here, there is an inference. And, again, Mr. Kamak's shares were the only ones that were called. With respect to, again, I said there's no complexity test. The question is whether or not you have discretion, unilateral discretion under the contract. And, again, if you look at the cases that we cited, he talked about Missouri Consolidated and that the court found that there was no breach of the covenant of good faith and fair dealing. The reason it did is because it said there was no evidence presented of bad faith. In the BJC Health Systems case, they reversed a judgment of law because the court improperly excluded evidence of bad faith. Bad faith has been an integral part of the assessment under the good faith and fair dealing covenant under Missouri law. And, again, certainly the facts here— No, no, I wasn't saying for a century. I'm saying for years, Your Honor. Going back, the case Stone Motor Company, which this court decided was 2002, BJC 2007, again, this court has repeatedly looked at it and continually identified bad faith as the criteria by which you judge unilateral discretion under a contract under the implied covenant. Again, when you talk about the formulation that appears in many of the opinions, again, it's in the disjunctive, and it talks about evade the spirit of the transaction or deny the other party the expected benefit of the contract. As I've pointed out, given the purpose of stock options, nothing could be more contrary to the spirit of the transaction than using this particular contractual arrangement for purposes of retaliation. And as you pointed out, Your Honor, in terms of expected benefit— Thank you, counsel. Your time is up. Thank you, Your Honor. We've got a long morning. The case has been effectively briefed and argued, and we'll take it under advisement.